Gautam Dutta, Esq. (State Bar No. 199326)
BUSINESS, ENERGY, AND ELECTION LAW, PC
1017 El Camino Real # 504
Redwood City, CA  94063
Telephone:  415.236.2048; Fax:  213.405.2416
Email:  Dutta@BEELawFirm.com

Attorneys for Plaintiff
HAONING RICHTER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HAONING RICHTER, an individual, | CASE NO. |
| *Plaintiff*, | |
| vs. | **COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF** |
| ORACLE AMERICA, INC., a Delaware corporation, | |
| and DOES 1 through 10, | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

INTRODUCTION

1. This case of corporate wrongdoing – a case of retaliation where a member of the senior management team was terminated simply for doing her job – spotlights the deficient compliance culture, lack of management accountability and control, and toxic work environment at one of the world's leading tech companies:  Oracle.

2. This case also vindicates the contractual right of an employee to bring her grievances to federal court – and stay a pending arbitral proceeding – pursuant to the express terms of a proprietary information agreement.

PARTIES AND JURISDICTION

3. Plaintiff **Haoning Richter,** an individual, resides in this judicial district (specifically,

Santa Clara County) and seeks damages in excess of $75,000.

4. Defendant **Oracle America, Inc.** ("Oracle"), a Delaware corporation, conducts business in this judicial district.[1]

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 (diversity jurisdiction).  Venue is proper in this judicial district pursuant to 28 U.S.C. §1391, because Defendant Oracle is subject to personal jurisdiction in this judicial district.

## FACTUAL BACKGROUND

6. On May 17, 2013, Joyce Westerdahl, Oracle's Executive Vice President (Human Resources) signed Ms. Richter's written offer of employment.

7. Ms. Richter's employment began on June 17, 2013 and was terminated on Nov. 7, 2017.  Ms. Richter, an Asian American, was born in China.

8. During her employment, Ms. Richter served as Audit Director.  She reported to Randall Smith, Oracle's then-Vice President of Global Real Estate and Facilities, with an annual budget of approximately $1 billion.  During Ms. Richter's employment, Mr. Smith reported directly to Oracle CEO Safra Catz.

9. At the time Ms. Richter was hired, Oracle's Legal Compliance Team had identified a number of significant compliance issues, and Oracle's Internal Audit Department had audit findings in multiple regions within Oracle's Global Real Estate and Facilities organization.

10. In response, Oracle CEO Safra Catz, Executive Vice President and General Counsel Dorian Daley, and then-Chief Compliance and Ethics Officer Mary Doyle approved the creation of the position of Audit Director within the Global Real Estate and Facilities organization.

---

[1]     Because Ms. Richter is ignorant of the true names and capacities of Defendants sued as Does 1 through 10, inclusive, she sues those Defendants by those fictitious names.  Ms. Richter will amend this Complaint to allege their true names and capacities when ascertained.  Upon information and belief, each of those Defendants is responsible in some manner for the occurrences alleged in this complaint, and Ms. Richter's damages as alleged in this Complaint were proximately caused by those Defendants.

COMPLAINT

11. The new Audit Director would have three staff reporting to her to establish the Global Process Controls Office.  The staff members were to be hired for the Europe, Middle East, and Africa (EMEA), Japan and Asia Pacific (JAPAC), and the Latin America (LAD) regions.

12. The new position of Audit Director was tasked to help build a safe and ethical compliance culture and to establish a new Global Process Controls Office by hiring three staff members to conduct global audit testing in order to evaluate the effectiveness of key processes and third-party vendor management, especially in the area of sourcing.

13. As Audit Director, Ms. Richter discovered and reported numerous issues relating to sourcing and vendor management.

14. **Sourcing,** also known as the Request for Proposal (RFP) process, is the process whereby a company obtains multiple bids from different vendors in order to select the best bid for the company.  During the relevant period, Oracle policy stated that it would "make every effort to encourage competition, provide fair and equal treatment of all bidders, ensure all bidders will have the same bid or proposal information at reasonably the same time and ensure that no bidder has an *unfair advantage* over another."[2]

15. Each year during her tenure, Ms. Richter received positive, written performance reviews, and was awarded a number of performance-related stock bonuses.

16. In his June 2014 performance review, Mr. Smith gave Ms. Richter a rating of "Exceeds expectations", and noted:  "[Ms. Richter] has *successfully launched* the [Global Real Estate and Facilities] Process Controls Office which was an FY14 operational goal."[3]  Moreover, in the core category of "Promoting Business Ethics", Mr. Smith also gave Ms. Richter a rating of "Outstanding".

17. In his July 2015 performance review, Mr. Smith gave Ms. Richter a rating of "Successfully meets expectations", and noted:  "[Ms. Richter] continues to establish a *new*

---

[2]   Italics added.
[3]   Italics added.

COMPLAINT

*and successful* Process Controls Office."[4]  Moreover, in the core category of "Promoting Business Ethics", Mr. Smith also gave Ms. Richter a rating of "Outstanding".

18. Subsequently, Mr. Smith did not give Ms. Richter any written evaluations.  Instead, he provided Ms. Richter with oral reviews.  In each of those reviews, Mr. Smith uniformly gave Ms. Richter a rating of "Exceeds expectations".

19. In 2014, Mr. Smith selected Ms. Richter for the Oracle Women's Leadership Program.

20. Because of her exceptional performance, Mr. Smith selected Ms. Richter to join Oracle's invitation-only, Accelerated Executive Insight (AEI) program on Mar. 2, 2017.  Ms. Richter was the only employee chosen to represent her Global Real Estate and Facilities organization, which has over 1,000 employees.

21. Spearheaded by two top business schools (including the University of Michigan's Ross School of Business), AEI aims to train and mentor Oracle's top talent to rise one to two levels above their current roles.  Towards that end, AEI's experts work with the top 5 percent of Oracle's employees who demonstrate outstanding performance and high-growth potential, identified through Oracle's Talent Review Board process.

22. During Ms. Richter's employment, Oracle issued annual, "performance-based equity awards" to eligible employees "whose present and potential contributions are important to [Oracle's] continued success[.]"  Those stock-incentive awards were awarded in July or August of each year.

23. To recognize her outstanding performance, Mr. Smith awarded Ms. Richter with Restricted Stock Units (RSUs) *every single year* of her employment at Oracle.

24. In fact, on Aug. 4, 2017, Ms. Richter received 250 *more* RSU awards than she had received in prior years.  Less than three months later, Ms. Richter's employment was terminated.

25. On several occasions in 2016 and a couple weeks before her employment was terminated in Nov. 2017, Mr. Smith and Ms. Richter also held discussions regarding her promotion to

---

[4]     Italics added.

COMPLAINT

a higher position.

26. However, when Ms. Richter raised the issue during one of their one-on-one meetings, Mr. Smith replied: "What about Carol?"  In so doing, Mr. Smith stated that Ms. Richter would not be promoted *until and unless* one of her white colleagues (Carol Leipner Srebnick, Oracle Director of Real Estate Advanced Planning) was promoted *before* Ms. Richter.

**First Incident of Retaliation Suffered by Ms. Richter**

27. In late 2013 or early 2014, Oracle's then-Facility Site Manager (Brian Crume) shared some concerns with Ms. Richter regarding unfair sourcing practices that he had observed at a sourcing event at Oracle's headquarters.  In so doing, Mr. Crume asked Ms. Richter to keep his name confidential.

28. In response, Ms. Richter spoke with Mr. Smith about Mr. Crume's concerns, without divulging Mr. Crume's identity.  Mr. Smith suggested that Ms. Richter discuss, with Mr. Crume's direct management team (including then-Vice President Michael Bangs at Oracle headquarters), the substance of Mr. Crume's concerns.

29. Like Ms. Richter, Mr. Bangs reported directly to Mr. Smith.

30. About two weeks later, a visibly upset Mr. Crume approached Ms. Richter.  Mr. Crume told Ms. Richter that Mr. Bangs had spoken with him.  During their conversation, Mr. Bangs stated that he had reached the following conclusion:  Mr. Crume had blown the whistle regarding Oracle's unfair sourcing practices.  From that conversation, Mr. Crume mistakenly assumed that Ms. Richter had divulged his identity, when she had not.

31. Subsequently, Mr. Crume left Oracle in June 2014 after having spent nearly 20 years with the company.  As a result of Mr. Bangs' actions, word began to circulate that Ms. Richter could not be trusted to keep confidences.  In response, Ms. Richter expressed concern regarding Mr. Bangs' actions to Mr. Smith.

32. Mr. Crume's concerns about Oracle's sourcing practices were no aberration.  During one of her audits, Ms. Richter discovered that in Mar. 2016, Oracle had improperly given preferential treatment to one vendor (Serco) over two other vendors (Sodexo and Vinci).

COMPLAINT

Specifically, Oracle had given Serco – the incumbent and winning vendor – a bonus of Euro 250,000 that *had not been part of Serco's winning bid.*

**Second Incident of Retaliation Suffered by Ms. Richter**

33. On Aug. 6, Aug. 7, Aug. 20, and Sept. 6, 2014, Ms. Richter and Oracle Senior Director Diane Currier engaged in several discussions to prepare for a Sept. 8, 2014 Denver pre-conference meet-and-greet (the "Denver Meet-and-Greet") of Ms. Currier's Oracle team.

34. In that regard, Ms. Richter and Ms. Currier discussed the topics and format for the Denver Meet and Greet. Because Ms. Currier's team did not have a clear understanding of sourcing requirements, Ms. Richter agreed to discuss that topic during the Denver Meet-and-Greet.

35. On Sept. 8, 2014, Ms. Richter addressed the Denver Meet-and Greet of 15 Oracle employees. Those 15 employees reported to Ms. Currier, who reported to Michelle Myer, Vice President (Oracle Real Estate and Facilities – Americas). In turn, Ms. Myer reported to Ms. Richter's supervisor Randall Smith.

36. During the Denver Meet-and-Greet, Ms. Richter engaged in a lively discussion with an employee as to whether, in the context of sourcing, a manager should perform any review or verification before approving vendor selection and budgets (Ms. Richter espoused the viewpoint of "Trust, but Verify"). This discussion turned into an uncomfortable debate, as that employee believed that any attempt by management to review or verify sourcing issues would damage management's trust relationship with employees.

37. During the discussion, Ms. Richter touched on a sensitive topic: how sourcing decisions should be made. That is, should sourcing decisions be based on what would ensure one's job security or on what would be best for the company? This topic led to a discussion regarding what characteristics that a good manager should possess. Ms. Richter collected everyone's feedback and put their feedback on a whiteboard for team discussion and review.

38. While making a point of how employees and managers can make bad decisions that hurt

COMPLAINT

the company's bottom line, Ms. Richter used the word "bullshit" when giving an example of one such decision.

39. After the meeting, the members of Ms. Currier's team – who had enjoyed the discussion – invited Ms. Richter to join them for dinner.

40. Neither Ms. Currier nor her supervisor Ms. Myer attended the Denver Meet-and-Greet and the team dinner, although Ms. Currier had earlier agreed to attend and help facilitate and introduce Ms. Richter to her team.

41. Approximately three years later (in Summer 2017), Ms. Currier again invited Ms. Richter to make an interactive presentation to the *same* team to whom Ms. Richter had spoken at the Denver Meet-and-Greet.  Ms. Currier's team again enjoyed the discussion, and appreciated Ms. Richter's insight into complex sourcing topics and how best to make sourcing decisions.

42. After the Summer 2017 presentation, Ms. Currier sent Ms. Richter an email thanking her for her effective presentation.  Ms. Currier added that team believed Ms. Richter's presentation had provided clarity to enable them to make better sourcing decisions.

43. On Sept. 15, 2014 (one week after the Denver Meet-and-Greet), Ms. Richter had her weekly one-on-one meeting with Mr. Smith.  During that meeting, Ms. Richter shared her experience and feedback from the Denver Meet-and-Greet – including her meetings with the teams headed by Ms. Currier, who reported to Ms. Myer.

44. After hearing Ms. Richter's account of the Denver Meet-and-Greet, Mr. Smith told Ms. Richter:  "Michelle [Myer, Ms. Currier's supervisor] is upset and she is not a forgiving person.  She would hold this against you *forever*."

45. Ms. Myer believed that Ms. Richter had betrayed her by discussing sensitive issues behind her back, especially Ms. Richter's discussion of the characteristics of a good manager. However, Ms. Myer did not know at the time that one of her own managers (Ms. Currier) had asked Ms. Richter to discuss those very issues with Ms. Currier's team at the Denver Meet-and-Greet.

COMPLAINT

46. Two months later, on Friday, Oct. 10, 2014, Vice President Michael Bangs – who had previously accosted Mr. Crume regarding his whistleblowing – called Ms. Richter at approximately 1 pm.  During their conversation, Mr. Bangs told Ms. Richter that he was at a social event (San Francisco Fleet Week) in San Francisco, and asked Ms. Richter to tell his team that they could leave work early that day.

47. Ms. Richter passed along Vice President Bangs' message only to the managers of his team, and asked them to make appropriate judgment calls before letting their staff leave early.

48. On Oct. 30, 2014, Oracle Senior HR Business Partner Judy Liljenwall initiated a meeting with Ms. Richter at Oracle's Santa Clara campus.  At the time, Ms. Liljenwall reported to Oracle's Human Resources Division.

49. At the beginning of the meeting, Ms. Liljenwall stated:  "I was asked to investigate what happened at Denver [i.e., the Denver Meet-and-Greet]."  Ms. Liljenwall then reprimanded Ms. Richter for using the word "bullshit" during the Denver Meet-and-Greet.

50. In response, Ms. Richter defended her use of the word "bullshit", because that word helped her make an important point on how employees can make bad decisions that hurt the company's bottom line.

51. During that meeting, Ms. Liljenwall also reprimanded Ms. Richter for showing "poor business judgment" for agreeing to Mr. Bangs' request to let his all of his team members know that they could leave early.

52. In response, Ms. Richter stated that she had acted appropriately when she accommodated Mr. Bangs' request to release his team early for the weekend.

53. Ms. Richter then asked Ms. Liljenwall whether she (Ms. Richter) had violated any company policy – and whether Mr. Bangs had shown poor business judgment in the first place.  In response, Ms. Liljenwall stated:  "Mike [Bangs] is different.  He is just a *big boy* and I will talk to him separately."

**Third Incident of Retaliation Suffered by Ms. Richter**

COMPLAINT

54. After the meeting with Ms. Liljenwall, Ms. Richter learned that Vice President Michelle Myer had blocked Ms. Richter from initiating the hiring of one of the three staff positions that would report to Ms. Richter, in response to the comments that Ms. Richter had made at the Denver Meet-and-Greet.  (Ms. Myer could block that hiring because the position was based in Oracle's Costa Rica office (LAD region), which is within Ms. Myer's territory.)

**Fourth Incident of Retaliation Suffered by Ms. Richter**

55. On Dec. 12, 2014, at the end of his weekly one-on-one meeting with Ms. Richter, Mr. Smith mentioned that he would be emailing a "warning" letter to her.  Mr. Smith told Ms. Richter to contact Judy Liljenwall if she had any questions.  Mr. Smith neither disclosed nor discussed any of the content of that letter before or during the Dec. 12, 2014 one-on-one meeting.

56. Subsequently, Ms. Richter received an email from Mr. Smith.  That email contained a file attachment entitled "Performance Warning" (Ms. Liljenwall was copied on the letter).

57. In that letter, Mr. Smith claimed that (1) Ms. Richter had shown a "[l]ack of sound business judgment", (2) Ms. Richter had used "inappropriate language" while meeting with managers, and (3) Ms. Richter's "credibility within the organization had declined."

58. Ms. Richter was shocked by Mr. Smith's letter, because its subject matter had never been brought up or discussed in any of the weekly one-on-one meetings between Mr. Smith and Ms. Richter.

59. Contrary to Mr. Smith's claims – which did not refer to any specific incident – Ms. Richter did not show any lack of "sound business judgment", and had a reputation at Oracle for honesty and candor.

60. While it reprimanded Ms. Richter for using what is deemed to be "inappropriate language", Oracle has not disciplined several high-level employees for engaging in inappropriate conduct and violating Oracle policy.

61. During an Oct. 1, 2015 business conference, Oracle senior director **John Cook** (who is

COMPLAINT

white) was seen wandering the hallways of the San Mateo Marriott Hotel intoxicated and in his underwear.  On the evening of Jan. 20, 2014, during a regional meeting in Malaga, Spain, then-Oracle operations manager **Sara Atkinson** (who is white) became so intoxicated that she could hardly attend business meetings the following morning.

62. Both employees' excessive, after-meal consumption of alcohol constitute direct violations to Oracle's Travel and Expense Policy:  "Oracle does not condone the excessive use of alcohol."

63. What is more, an Oracle senior director (**Lindsay Pomeroy,** a white male who reported to Vice President **Michelle Myer**) was not disciplined *at all* after he unilaterally approved a $28,081,558 vendor selection without going through the required bidding process on Sept. 18, 2017, even though he had no authority to do so.[5]  During her Sept. 28, 2017 one-on-one meeting with Mr. Smith, Ms. Richter apprised Mr. Smith, orally and in writing, of Mr. Pomeroy's unilateral vendor selection.

64. Mr. Cook, Ms. Atkinson, and Mr. Pomeroy were not reprimanded or disciplined for engaging in inappropriate conduct and violating Oracle policy.

**Fifth Incident of Retaliation Suffered by Ms. Richter**

65. In Dec. 2016, Ms. Richter heard from two different sources that Vice President Ken Heth and Director of Operations Patrizia Muckle – two top officials in Oracle's Japan and Asia Pacific (JAPAC) region – were using proprietary process documents belonging to SAP.

66. Mr. Heth joined Oracle from SAP in Feb. 2015.  Subsequently, Mr. Heth hired Ms. Muckle from SAP in Sept. 2015.  (Mr. Heth and Ms. Muckle had worked together when they were employed with SAP.)

67. Ms. Richter shared, with Mr. Smith, the information regarding the use of SAP's proprietary documents.  Because Oracle and SAP are industry rivals, Ms. Richter suggested that either Mr. Smith or Ms. Richter herself should apprise Mr. Heth of those

---

[5]       Mr. Pomeroy had the authority to approve vendor-selection decisions without going through Oracle's bidding process only if the total amount at issue was under $100,000.

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

rumors in order to reduce Oracle's exposure to risk.

68. In response, Mr. Smith instructed Ms. Richter *not* to perform any investigation of the matter, and told her that he would raise the issue with Mr. Heth and Ms. Muckle.

69. Over the next two to three months, Mr. Heth and Ms. Richter engaged in an animated email exchange on which Mr. Smith was copied.  At the end of that Feb. 1, 2017 email exchange, Ms. Richter told Mr. Heth that if he continued to pressure her to provide evidence, she would have to share her concerns with Oracle's Legal Department – which would likely launch an investigation.

70. Mr. Heth responded to Ms. Richter via email:  "I am not requesting a full investigation, simply a follow up to the source for validation.  Nothing more.  I can't categorically say there is not a template out there but if there is, it was an honest mistake and it should be easily rectified."  Mr. Heth added that he did not want Oracle's Legal Department to launch an investigation.

71. Subsequently, Mr. Smith told Ms. Richter that Mr. Heth had made a complaint about her, because (1) Ms. Richter had raised the possibility of referring the SAP-document matter to Oracle's Legal Department, and (2) Ms. Richter had not been "nice" to him at the time they were discussing the issue of using SAP's proprietary process documents.  Mr. Smith added that he agreed with Mr. Heth – because Ms. Richter did not possess any validated evidence and should not have shared such concerns with him (Mr. Smith).

72. Contrary to Mr. Smith's claim, the "speak up expectations" of Oracle's anti-retaliation policy encouraged employees to voice their good-faith concerns with management – and did not require employees to obtain validated evidence before voicing their concerns.

73. Mr. Smith's reason for siding with Mr. Heth was ironic, particularly because Mr. Smith had *banned* Ms. Richter from investigating the very matter for which she lacked documentary evidence.

74. On Feb. 16, 2017, Ms. Richter presented a list of 12 discussion topics during her one-on-one meeting with Mr. Smith in writing.  The first topic was "SAP in JAPAC".  As part of

COMPLAINT

that topic, Ms. Richter discussed the risks of using SAP proprietary documents at Oracle, and asked Mr. Smith for clarity on when she was expected to validate (seek documentation or evidence regarding) such issues or concerns.  In addition, Ms. Richter raised the concern that Oracle's management lacked accountability on recurring sourcing issues and findings.

75. On Apr. 26, 2017, Ms. Richter spoke with Mr. Heth at Mr. Smith's staff meeting in Japan regarding the upcoming kickoff meeting for an audit testing project involving one of his construction projects in Hong Kong.  During their conversation, Mr. Heth and Ms. Richter agreed on the topics would be covered during the kickoff meeting.

76. Subsequently, when Ms. Richter convened the audit kickoff meeting via conference call on May 3, 2017, Mr. Heth not only denied that he and Ms. Richter had agreed upon the topics to be covered, but lashed out at – and undermined – Ms. Richter's leadership and authority in front of her subordinate (Grace Liu) and a group of Oracle directors, managers, and individual contributors.

77. Mr. Heth continued his verbal assault on Ms. Richter for at least 10 minutes, and demanded that Ms. Richter *not* work on any part of the audit testing project.  Instead, Mr. Heth demanded that Grace Liu – a Singapore-based employee *who reported to Ms. Richter* but worked from the same office as Mr. Heth – solely work on the project.

78. In addition to Mr. Heth and Ms. Richter, the following Oracle employees participated in that conference call:  Grace Liu (who reported to Ms. Richter), Meng Choo Chia (who reported to Mr. Heth), Liyuan Mo (who reported to Mr. Keth), Hugh Ho (who reported to Mr. Mo), Jason Woodward (who reported to one of Mr. Smith's staff), and Rod Jehlik (who reported to Mr. Woodward).

79. Immediately after the audit kickoff meeting, Ms. Richter used her cell phone to call Mr. Heth at his Singapore office.

80. During that conversation, Mr. Heth admitted that he had overreacted.  Ms. Richter then told Mr. Heth that Ms. Liu's job performance had not been satisfactory for the past couple

COMPLAINT

of months.  Ms. Richter also informed Mr. Heth that Ms. Liu had refused to work together with Ms. Richter to perform the review and audit for the Hong Kong construction project at issue.

81. The next morning, Ms. Richter apprised Mr. Smith of what had occurred at the audit kickoff meeting, and informed him how Mr. Heth had publicly humiliated her.

82. On Monday, Oct. 9, 2017, Oracle Vice President Ken Heth traveled from Singapore to Oracle headquarters to attend the Oracle Global Real Estate and Facilities Project Management Conference.  Ms. Richter spoke with Mr. Heth in person at her headquarters office about retaliation:  namely, how she had felt that he had retaliated against her when he humiliated her and undermined her leadership during the May 3, 2017 audit kickoff meeting.

**Sixth Incident of Retaliation Suffered by Ms. Richter**

83. On Friday afternoon, Oct. 20, 2017, Oracle Senior Employment Practices Consultant Mark Lane emailed Ms. Richter and requested to speak with her regarding an investigation.  Mr. Lane, who reports to Oracle's Human Resources Division, did not specify what topics that the conversation would cover.

84. Three days later (Monday, Oct. 23, 2017), Mr. Lane called Ms. Richter at 10 am, and the call lasted approximately 45 minutes.

85. Mr. Lane introduced himself as an experienced and certified investigator.

86. Mr. Lane then explicitly referred to the fact that Ms. Richter is a first-generation immigrant:  "You are not from this country.  How long have you been here?  How many places have you lived?"

87. Referring to the country where Ms. Richter was born, Mr. Lane then sneered:  "I know *your country* has this gift culture."

88. Mr. Lane then condescendingly asked Ms. Richter:  "Do you understand that Oracle has a travel policy?"

89. Mr. Lane asked Ms. Richter regarding eight expense items for which she had obtained

COMPLAINT

reimbursement from Oracle.  Of those eight items, three questions related to expenses from 2015, four questions related to expenses from 2016, and one question related to an expense from Mar. 2017.  The amount of those eight items totaled to $574.15.

90. Throughout the call, Mr. Lane subjected Ms. Richter to an inappropriate, faux-Perry Mason-style interrogation, which consisted of repeated – and picayune – questions that implied that she had committed grave wrongdoing.

91. Just as one example, Mr. Lane asked:  "You expensed a lot of coffee.  You purchased a coffee tumbler at Peet's Coffee in 2016.  *Why did you do that?*"  (Ms. Richter answered that because she needed a lot of coffee to stay productive, she bought a coffee tumbler to keep coffee hot so it would last longer on a travel day, especially while working around the clock.)

92. In another example, Mr. Lane asked:  "On Apr. 7, 2016, you ate at Harley Davidson Café at Las Vegas and expensed a beer glass.  *Why did you do that?*"  (Ms. Richter answered that the beer and glass were a promotional package deal for $12.50:  the eatery would have charged her the *same* amount regardless of whether or not she had wanted the beer glass.)

93. In another example, Mr. Lane asked:  "In 2014 or 2015, did Grace [Liu, who worked out of the same Oracle office as Mr. Heth and Ms. Muckle] give you a box of See's candies?  Or did you ask her for a box of See's candies?"  (Ms. Richter answered that Ms. Liu had given her an extra box of candies that she [Ms. Richter] had not requested.  Ms. Richter then gave the candy box to Vasile Dascalu, one of her team members.)

94. During the phone call, Mr. Lane also asked Ms. Richter what she did on May 19, 2016.  In response, Ms. Richter stated that she did not remember.

95. Mr. Lane then asked, "How come?  Who did you have dinner with that evening and where?"  He angrily added, "You should be able to remember and answer my question."

96. Toward the end of Mr. Lane's interrogation, Ms. Richter told him that she believed she was being retaliated against, and she asked Mr. Lane for the real reason why the

interrogation was being conducted.

97. Interrupting Ms. Richter, Mr. Lane raised his voice:  "*Stop* – I don't want to hear about it and I don't care."  Mr. Lane stated that (1) his "job" was to "document" Ms. Richter's "wrongdoing" based on his "list", and (2) he would present his findings to HR so that "disciplinary actions" could be taken against Ms. Richter.

98. Mr. Lane's unjustified, brutal interrogation shocked Ms. Richter and left her shaken for the remainder of her tenure at Oracle.  During that interrogation, Mr. Lane warned Ms. Richter not to share their conversation with anyone.

99. Oracle Global Travel and Expense Policy stated that an employee may expense up to $120.00 per meal.  During her tenure at Oracle, Ms. Richter traveled around the globe and submitted 53 expense reports totaling 440 pages.  All of those expense reports had been personally reviewed and approved by Mr. Smith.

100.    In those expense reports, Ms. Richter was reimbursed an average of **$23.10** per meal for 146 meals:  namely, nearly **$97** *less than* Oracle's allowed $120.00 per business meal.

101.    Moreover, under Oracle's Spend Approval Policy, an employee of Ms. Richter's level (M4) can authorize up to $5,000 in expenses, including travel-related expenses.

102.    By getting reimbursed for $97 less than Oracle's allowed $120.00 per business meal, Ms. Richter saved Oracle *over $14,000*.[6]

**Ms. Richter's Concerns about Grace Liu**

103.    Upon information and belief, Grace Liu – a disgruntled former employee who, while reporting to Ms. Richter, worked from the same Singapore office as Mr. Heth and Ms. Muckle – was responsible for making a hotline complaint against Ms. Richter.

104.    During his interrogation of Ms. Richter, Mr. Lane had mentioned Ms. Liu, in connection with the box of See's candies.

---

[6]    Specifically, $14,147, derived from 146 business meals @ an average savings of $96.90 per business meal.

COMPLAINT

105.     Ms. Liu had repeatedly received negative feedback about her performance from Ms. Richter.

106.     Between Mar. 9, 2017 and Aug. 4, 2017, during a number of her one-on-one meetings with Mr. Smith, Ms. Richter had raised performance concerns about Ms. Liu.

107.     Ms. Liu resigned on Aug. 1, 2017, one day after she had received an in-depth, verbal performance review from Ms. Richter.

108.     At the time she was terminated, Ms. Richter was about to schedule a flight to Singapore to interview the final five candidates for Ms. Liu's replacement.  Tellingly, when Ms. Richter sought to discuss Ms. Liu's replacement at the end of her final meeting with Mr. Smith on Nov. 2, 2017, he abruptly blurted out his response:  "We decided to terminate your employment."

**Ms. Richter's Discussion with Mr. Smith Regarding Retaliation and Oracle's Travel and Expense Policy Following Mr. Lane's Interrogation**

109.     On Oct. 25, 2017 (two days after Mr. Lane's interrogation), Ms. Richter had her weekly one-on-one meeting with Mr. Smith.  Ms. Richter informed Mr. Smith about her discussion with Mr. Heth on Oct. 9, 2017.  Ms. Richter added that she sought to protect both Oracle and its management team by voicing her concern about Mr. Heth's and Ms. Muckle's using SAP documents at Oracle.  However, Ms. Richter told Mr. Smith that she was disappointed for being challenged and pressured to provide concrete evidence, as Mr. Heth and Ms. Muckle had demanded.

110.     Ms. Richter also expressed, in her written agenda for the meeting and during the meeting itself, her concern regarding the accountability of management due to recurring sourcing findings and issues that had not been addressed.

111.     Ms. Richter also explained to Mr. Smith that Oracle's anti-retaliation policy encouraged employees to voice their claims or concerns, without requiring employees to conduct any independent investigation that would obtain evidence to substantiate their claims or concerns.

COMPLAINT

112.     Because Mr. Lane had warned her not to share their "conversation" with anyone, Ms. Richter did not mention Mr. Lane's interrogation to Mr. Smith.  Instead, she provided a hard copy of the Oracle Travel and Expense Policy to Mr. Smith, and flagged the relevant sections of the Policy about which Mr. Lane had interrogated her.

113.     Among other things, Ms. Richter clarified and confirmed her understanding of the Oracle Travel and Expense Policy with Mr. Smith.  Ms. Richter also emphasized to Mr. Smith that she wanted to ensure that she and Mr. Smith had the same understanding of the Policy, and took the opportunity to explain how she made certain judgment calls.

114.     At the time, Ms. Richter believed that her Oct. 25, 2017 one-on-one meeting with Mr. Smith had gone well; and she believed that Mr. Smith would help clarify matters when HR brought him the report from Mr. Lane's "investigation".

**Prior Instances of Expense-Report Investigations Sought by Mr. Smith**

115.     *Joe Gumina*.  In Summer 2014, Mr. Smith asked Ms. Richter to investigate the past expense reports of Joe Gumina, then the Vice President of Oracle's Japan and Asia Pacific (JAPAC) region.  Mr. Smith had previously reviewed and approved MR. Gumina's expense reports.

116.     At the time, it was no secret that Mr. Smith and Mr. Gumina, who reported directly to Mr. Smith, had a strained relationship.   Earlier, Mr. Smith had taken away the Latin American region from Mr. Gumina's responsibilities and given that responsibility to Vice President Michelle Myer, a longtime friend of Mr. Smith's.

117.     Before Ms. Richter took any action, Mr. Gumina resigned and left around Sept. 2014, after having worked for Oracle nearly two decades.

118.     *Meng Choo Chia*.  In Winter 2014, Mr. Smith informed Ms. Richter that management had concerns with certain expense reports that had been submitted by Meng Choo Chia, then-project manager at Oracle's Singapore office.  Although those expense reports had been reviewed and approved by management, Mr. Smith asked Ms. Richter to investigate.

COMPLAINT

119.     At Oracle, only the direct manager (Ms. Chia's supervisor), direct management chain, and the Accounts Payable Department have access to the employees' expense reports.  Since Ms. Richter was not part of Ms. Chia's direct management chain and did not work for Accounts Payable, she sent an email request to Accounts Payable in order to access Ms. Chia's expense reports.

120.     A couple days later, Accounts Payable informed Ms. Richter that she would need to obtain the Legal Department's approval for any expense-report-related investigation before requesting access to any employee's expense reports.

121.     After Ms. Richter informed Mr. Smith that the legal department's approval was required to launch an expense-report investigation, Mr. Smith responded:  "Never mind."

122.     *Pururaj Rathore*.  During the week of Apr. 11, 2016, Mr. Smith hosted his staff leadership conference at Oracle headquarters in Redwood City.  During that week, Ken Heth met with Ms. Richter in person, and told her that he had concerns about one of his direct reports:  Pururaj Rathore, then-Director of Oracle's Japan and Asia Pacific (JAPAC) region.

123.     Specifically, Mr. Heth stated that he had strong suspicions about several of Mr. Rathore's past travel-related expense reports.

124.     In response, Ms. Richter asked if Mr. Heth had questioned Mr. Rathore about those expense reports before approving them.  In response, Mr. Heth stated that he had approved all of Mr. Rathore's expense reports at issue.

125.     A couple of weeks later, Mr. Smith asked Ms. Richter to conduct an expense-report investigation on Mr. Rathore.  Mr. Smith stated that Mr. Heth had concerns about Mr. Rathore's expense reports and asked Ms. Richter to look for violations of Oracle's Travel and Expense Policy.

126.     Ms. Richter then reminded Mr. Smith that she would need to approach Oracle's legal department for approval before she could conduct such an investigation.

127.     In response, Mr. Smith said, "Oh, yes, I forgot about that.  Never mind then."

COMPLAINT

128.     Mr. Rathore left Oracle a couple of months later.

**Seventh Incident of Retaliation Suffered by Ms. Richter**

129.     On Thursday, Nov. 2, 2017, at the end of Ms. Richter's weekly one-on-one meeting with him, Mr. Smith asked Ms. Richter for her Oracle badge.  He then told Ms. Richter:  "We decided to terminate your employment."

130.     In response, Ms. Richter asked Mr. Smith, "Is this a joke?"  Mr. Smith responded, "No it is not a joke."

131.     When Ms. Richter asked why she was being fired, Mr. Smith responded:  "You know you've been investigated for your expense reports."

132.     Mr. Smith stated that the reason for the termination would be stated in the termination package that would be mailed to her.  He also told Ms. Richter that he would inform all parties concerned about her termination, and demanded that she not "approach anyone" regarding her termination.

133.     At the time of her termination, Ms. Richter was only days away from receiving a cash bonus.  Because she was terminated, she also lost all unvested, performance-related stock bonuses that she had been previously awarded.

134.     On Friday morning, Nov. 3, 2017, Ms. Richter received an email, from Oracle Human Resources, that had a subject line of "Attention:  Voluntary Termination" and contained an attachment entitled "*Voluntary* Termination Packet_2017.pdf".[7]  However, Ms. Richter did not resign or otherwise leave her employment voluntarily.  By sending its "voluntary termination" email, Oracle inflicted severe emotional anguish upon Ms. Richter.

135.     On Nov. 7, 2017, Ms. Richter received a FedEx package, entitled "Involuntary Termination Packet", from Oracle that contained a termination package.

136.     None of Oracle's termination documents stated any reason for Ms. Richter's termination.

---

[7]     Italics added.

COMPLAINT

137.     As documented in her Mar. 8, 2018 letter to California's Private Attorneys General

Act (PAGA) Administrator, Ms. Richter was not paid the full wages due to her in her final

paycheck.

138.     On Dec. 26, 2017, the day after Christmas, California's Employment Development

Department (EDD) requested a phone interview with Ms. Richter in order to determine

whether she was eligible for unemployment benefits.  Having to undergo such an

"interview" during the holiday season caused Ms. Richter to suffer sharp emotional

anguish.

*Grave Harm to Ms. Richter's Reputation*

139.     During the week when she was terminated, Ms. Richter was finalizing Oracle's

Statement of Work (SOW) with KPMG for an audit for a construction project in Seattle.

In that capacity, Ms. Richter was working closely with a KPMG Director and a KPMG

Manager.

140.     During that same week, Ms. Richter was also finalizing Oracle's internal audit

responses to address Oracle internal audit findings on behalf of the global teams of Real

Estate and Facilities.  In addition, Ms. Richter had also been working with Oracle's Global

Procurement team and the legal counsel of Oracle's Procurement team.

141.     One month before Ms. Richter was terminated, Mr. Smith had authorized her to fly

to Dublin, Ireland to conduct a joint audit of a construction project with the PwC audit

team.  Ms. Richter had made a roundtrip flight reservation for Nov. 6, 2017 – the Monday

after she was terminated – to fly from the Bay Area to Dublin, Ireland in order to perform

the on-site audit with the PwC team.

142.     In that capacity, Ms. Richter was working closely with a PwC Partner, a PwC

Director, and a PwC Manager to kick off joint audit efforts, evaluate risks, design the

audit scope, and audit programs.  Ms. Richter successfully initiated a purchase order to

PwC for this Dublin audit project, which was approved by both Mr. Smith and his

supervisor, Oracle CEO Safra Catz.

COMPLAINT

143.     Ms. Richter's sudden disappearance gravely damaged her reputation and employment prospects within and outside of Oracle – especially in the tightly knit audit community, in which Oracle, PwC, and KPMG play outsized roles.

144.     To date, Ms. Richter has been unable to find comparable new employment.

*Emotional Distress and Bodily Harm Suffered by Ms. Richter*

145.     Beginning with Mr. Lane's brutal, outrageous interrogation, Ms. Richter suffered both severe emotional distress and bodily harm.  Among other things, Ms. Richter was fired immediately before a pre-scheduled, three-week vacation to China for Thanksgiving and the Christmas holidays.  As a result, she was unable to enjoy her holidays and international trip.  Instead, she has experienced profound pain and sadness to this day, and still has difficulty sleeping.

*Failure to Produce Documents in a Timely Manner*

146.     Ms. Richter's Jan. 19, 2018 letter to Oracle requested copies of (1) all records pertaining to her employment, (2) all documents signed by her relating to her employment, and (3) her personnel records relating to her performance or to any grievance concerning her employment.  In response, Ms. Richter received a late, incomplete production of wage-related documents and an incomplete production of personnel documents.

**RELEVANT PROCEDURAL BACKGROUND**

147.     *Filing of Complaint with State Court.*  On Oct. 29, 2018, Ms. Richter initiated an action, entitled *Haoning Richter v. Oracle America, Inc., et al.* (Santa Clara Sup. Ct. No. 18-CV-337194), with the California Superior Court, Santa Clara County (the "State Court").

148.     *Transfer of Ms. Richter's Non-PAGA Claims to Arbitral Proceeding.*  On May 3, 2019, the State Court ruled that Ms. Richter was bound by the terms of an arbitration agreement (the "Arbitration Agreement").

149.     On that basis, the State Court ruled that all of Ms. Richter's claims, except for her

claims brought under the Private Attorney General Act (Labor Code §§2698, et seq., hereinafter "PAGA"), were subject to arbitration.

150.    As a result, all but Ms. Richter's PAGA claims were transferred to an ongoing JAMS arbitral proceeding (JAMS Ref. No. 1100106052, the "Arbitral Proceeding").  Ms. Richter's PAGA claims were stayed pending the outcome of the Arbitral Proceeding.

151.    To date, no arbitral judgment has been rendered as to any of Ms. Richter's claims against Oracle.[8]

152.    *Oracle's Proprietary Information Agreement.*  As a condition of her employment, Ms. Richter was required to agree to the terms of Oracle's Proprietary Information Agreement ("PIA", **Exh. A**).

153.    Oracle's employment and arbitration agreement (the "Arbitration Agreement", **Exh. C**) expressly references the PIA:  "In addition to signing this Agreement as a condition of employment, you *must also sign* the Proprietary Information Agreement included in the New Hire Offer Packet."[9]

154.    In the PIA, Ms. Richter stated that she "w[ould] not enter into any agreement, written or oral, that conflicts with the provisions of this agreement."

155.    The PIA, which does not reference the Arbitration Agreement, further stated that the PIA would "survive [Ms. Richter's] employment."

156.    According to a document (**Exh. B**) produced by Oracle's custodian of record, Ms. Richter electronically agreed to the terms of the PIA at 3:56 pm on May 20, 2013, one minute after she had electronically agreed to the terms of the Arbitration Agreement.

157.    *RPD Item 2.*  From the onset of this litigation, Oracle had actual notice that Ms. Richter had retained Oracle-related documents.  For instance, Paragraphs 68 and 69 of

---

[8]    Ms. Richter alleges all of her non-PAGA claims against Oracle in this action.  Ms. Richter's non-PAGA claims against Joyce Westerdahl (stemming from the untimely production of employment records) were dismissed from the arbitral proceeding on Sept. 21, 2021.  Ms. Richter will not pursue any claims against Ms. Westerdahl in this action, and will not pursue any of her PAGA claims (which are pending before the State Court) in this action.

[9]    Italics added.

1
2
3
4

Ms. Richter's State Court complaint made reference to, and quoted from, email correspondence from 2017 between Ms. Richter and Oracle Vice President Ken Heth, with respect to the issue of whether Mr. Heth and members of his team had been using SAP proprietary documents at Oracle.

5
6
7

158.     Two years after this litigation was filed, Oracle requested, as part of Item 2 ("Item 2") of a Nov. 3, 2020 Request for Production of Documents (Set 1) (hereinafter, "RPD"), documents that Ms. Richter had retained from her employment at Oracle:

8
9
10
11
12
13
14

> Any and all DOCUMENTS that YOU *retained or kept* in YOUR possession from YOUR employment at ORACLE, including, but not limited to, performance evaluations regarding YOU or members of YOUR team at ORACLE; expense reimbursement information for YOU or members of YOUR team at ORACLE; ORACLE policies and procedures relating to ethics, compliance, sourcing practices, or vendor selection; and DOCUMENTS relating to SAP.[10]

15
16
17

159.     In response, on Dec. 15, 2020 Ms. Richter produced documents responsive to Item 2, without waiving the objections (including overbreadth, ambiguity, and lack of relevance) that were raised in her responses (the "RPD Responses")[11] to Item 2:

18
19
20
21
22
23
24
25

> Objection.  The information sought is *irrelevant* to the subject matter of this litigation and is not reasonably calculated to lead to admissible evidence; and the Item is *overbroad*.  The words "YOU" and "YOUR", the word "DOCUMENTS", the phrase "expense reimbursement information", the words "ethics" and "compliance", and the phrases "from your employment" and "DOCUMENTS relating to SAP" are *vague and ambiguous*.  *Without waiving those objections*, Ms. Richter responds:  Ms. Richter will produce (or has already produced) all

26

27      [10]     Italics added.
28      [11]     In the interest of brevity, the documents that were attached to the RPD Responses have been omitted.

COMPLAINT

responsive documents in her possession, custody, on control.[12]

160.     Subsequently, on Jan. 4, 2021 Oracle sent Ms. Richter a meet-and-confer letter in connection with her RPD Responses.  Oracle's letter did not address Item 2, and the Parties did not discuss Item 2 in any meet-and-confer communications.

161.     The 45-day deadline to file any motion to compel with respect to Item 2 passed on Jan. 29, 2021.

162.     *Oracle's Motion To Impound Ms. Richter's Personal Computer.*  However, nearly eight months later, Oracle sought a forensic audit of Ms. Richter's personal computer (a MacBook), on the false ground that Ms. Richter had improperly withheld documents responsive to Item 2.

163.     During a Sept. 17, 2021 deposition, Ms. Richter stated that, after learning that her employment would be terminated, she had retained Oracle-related documents on her personal computer.  She further testified that she retained those documents because she sought to determine the true reason behind her sudden firing.  Ms. Richter has not shared any of those documents with anyone other than her legal counsel.

164.     Contrary to Oracle's claim, Ms. Richter did not commit any discovery misconduct.  Indeed, she did not improperly withhold any documents in response to Item 2.  Ms. Richter raised objections to Item 2, and Oracle did not contest those objections within the statutory, 45-day period.

165.     During a Sept. 20, 2021 conference call of the Parties with the arbitrator, Oracle (1) claimed that Ms. Richter had violated the PIA, and (2) claimed that by violating the PIA, Ms. Richter may have violated federal law.

166.     In response, and without seeking written briefs from both sides, the arbitrator entered a preservation order (the "Preservation Order", entitled Pre-Hearing Order No. 25) on that same date.  The Preservation Order required Ms. Richter to "preserve intact" her personal computer.

---

[12]     Italics added.

167.    The next day (Sept. 21, 2021), Oracle filed a Motion for Forensic Examination.[13] In that motion, Oracle (1) claimed that Ms. Richter violated the PIA, and (2) asserted that it had the legal right to litigate any PIA-based claims against Ms. Richter in the arbitral proceeding.  In her opposition papers, Ms. Richter stated that she had the legal right under the PIA to litigate any PIA-related issues in a judicial forum.

168.    One day later (Sept. 22, 2021), during a conference call of the Parties with the arbitrator, the arbitrator asked Oracle's counsel to inquire into the availability of a forensic computer vendor that had been recommended by Oracle's counsel.

169.    That same day (Sept. 22, 2021), the arbitrator issued an order (Pre-Hearing Order No. 27 that set a hearing on Oracle's Motion for Forensic Examination for Sept. 29, 2021.

170.    Pre-Hearing Order No. 27 also directed Oracle's counsel to promptly inquire into the availability of a forensic computer vendor that had been recommended by Oracle's counsel.

171.    Ms. Richter's personal computer held sensitive, private information not only of herself, her spouse, other family members, and her friends, privileged communications with her legal counsel, as well as confidential information of hundreds of third parties, including but not limited to:  Santa Clara University's confidential policies, processes, contracts, and Ms. Richter's personnel files; confidential records of hundreds of her current and former students at Santa Clara University; confidential records of her former students at University of California – Santa Cruz Silicon Valley Extension; confidential, NDA-protected personal records of hundreds of executive members of Financial Executives International (Silicon Valley Chapter); confidential, NDA-protected information of the International Association of Privacy Professionals; and personal and confidential information of the members (who are legal professionals) of the Bay Area Ethics and Compliance Association.

---

[13]    Out of an abundance of caution, Ms. Richter has not attached the exhibits to all motions cited in this Complaint, but would be happy to provide them upon the Court's request.

COMPLAINT

172.     Ms. Richter used her personal computer regularly in connection with her employment at Santa Clara University.  To that end, Ms. Richter took her personal computer whenever she went to the Santa Clara University campus or met with students near campus.

173.     On Sept. 29, 2021, Ms. Richter filed an *ex parte* Application with the State Court for a temporary restraining order (TRO) to enjoin the impoundment of her personal computer and the Arbitral Proceeding as a whole.  In her Application, Ms. Richter asserted, *inter alia*, that the State Court had the authority to hear the entirety of Ms. Richter's claims, because the PIA entitled her to transfer all of her arbitral claims to the State Court.

174.     *The Arbitral Impoundment of Ms. Richter's Computer.*  The next day (Sept. 30, 2021), while Ms. Richter's TRO Application was still pending, the arbitrator granted Oracle's request to impound her Personal Computer, by way of a written order (Pre-Hearing Order No. 29, the "Impoundment Order").

175.     In the Impoundment Order, the arbitrator granted Oracle's impoundment request.  As a result, the constitutional right to privacy of Ms. Richter, her spouse, other family members, and third parties was violated.[14]

176.     Specifically, the arbitrator's Impoundment Order overruled Ms. Richter's overbreadth objections to Item 2.  Ms. Richter had raised those objections *nearly one year earlier* (on Dec. 15, 2020).

177.     Subsequently, on Oct. 4, 2021 the State Court issued an order that denied Ms. Richter's TRO Application.

178.     The arbitrator's Impoundment Order did not make any determination as to whether Ms. Richter's copying and retention of Oracle files constituted improper or wrongful

---

[14]     As part of a privilege review of certain documents that were obtained from Ms. Richter's personal computer, the arbitrator has granted Oracle counsel access to review the contents of a number of documents containing the private information of Ms. Richter, as well as that of her spouse, relatives, and other third parties.

COMPLAINT

conduct.

179.     For this reason, Ms. Richter suspended her effort to enjoin the Arbitral Proceeding.

180.     *Oracle's Concealment of Ms. Richter's Work Computer.*  Three days later (**Oct. 7, 2021**), after being consecutively asked by Ms. Richter's counsel and by the arbitrator, Oracle disclosed that it had possession of the work computer (the "Work Computer") that Ms. Richter had used during her employment at Oracle.

181.     Oracle later disclosed that it had located the Work Computer on **Sept. 29, 2021:** the *same* day on which Ms. Richter had filed her TRO Application, and the day *before* the arbitrator granted Oracle's motion to impound Ms. Richter's personal computer.

182.     Oracle thus concealed, from Ms. Richter and the arbitrator, the fact that it had located the Work Computer from Sept. 29, 2021 through Oct. 7, 2021.

183.     Had Oracle's counsel voluntarily disclosed that the Work Computer had been located, a reasonable arbitrator would have denied – or at least delayed ruling on – Oracle's motion to impound Ms. Richter's personal computer.

184.     Due to Oracle's belated disclosure that it had possession of the Work Computer, the arbitrator cancelled the Oct. 25, 2021 hearing date for the Arbitral Proceeding, by way of a written order (Pre-Hearing Order No. 31).

185.     *Ms. Richter's Discovery That Oracle Had Withheld Evidence.*  After conducting a forensic examination of the Work Computer, Ms. Richter learned that Oracle had failed to produce a large number of relevant documents, including but not limited to (a) documents relating to the Denver Meet and Greet, and (b) documents relating to a flight-related medical accommodation which Oracle had raised during a Sept. 17, 2021 deposition to improperly challenge Ms. Richter's credibility.

186.     In response, on Apr. 25, 2022 Ms. Richter filed a Motion for Sanctions against Oracle.

187.     In its opposition to Ms. Richter's Motion for Sanctions, Oracle claimed that Ms. Richter had violated the PIA:  "[Ms. Richter's] actions violated Oracle policy and her

COMPLAINT

*Proprietary Information Agreement.*"[15]

188.     To that end, Oracle claimed that Ms. Richter was not entitled to relief because she purportedly had "unclean hands".

189.     Characterizing Ms. Richter's actions as "*theft* of data and documents",[16] Oracle stated that it will seek sanctions against Ms. Richter for her "misconduct":  "Oracle intends to seek sanctions when it finally receives *all of the documents [Ms. Richter] kept* and is able to examine [Ms. Richter] regarding the full circumstances of her *misconduct.*"[17]

190.     In her Reply, Ms. Richter stated that she had the legal right under the PIA to litigate any PIA-related issues in a judicial forum, if Oracle continued to insist that she had "improperly copied Oracle files".

191.     *The Arbitrator's Characterization of Ms. Richter's Copying and Retention of Oracle Documents.*  During the June 29, 2022 hearing on Ms. Richter's sanctions motion, the arbitrator stated, for the first time, that Ms. Richter's copying certain Oracle documents from the Work Computer "may well have been *wrongful*".[18]

192.     Furthermore, in an order issued the next day (June 30, 2022), the arbitrator made a determination – for the first time in any of his orders – that Ms. Richter's "*copying and retention* of Oracle documents" was "*improper*".[19]

### FIRST CLAIM FOR RELIEF

*Declaratory Relief (28 U.S.C §§2201 et seq.)*

Against Defendant Oracle

193.     Paragraph 2 through 5 and Paragraphs 147 through 192 are hereby incorporated by reference.

194.     A legal controversy has arisen regarding the Parties' legal rights under the PIA.

---

[15]     Italics added.
[16]     Italics added.
[17]     Italics added.
[18]     Italics added.
[19]     Italics added.

COMPLAINT

195.    Pursuant to Paragraph 12 of the PIA (**Exh. A**), Ms. Richter seeks a judicial declaration that she has the contractual right to litigate, in this Court, (a) the legal issue of whether or not she can be held liable under the PIA, and (b) all of her pending legal claims in the Arbitral Proceeding.

SECOND CLAIM FOR RELIEF

*Retaliation for Exercising Rights Protected by the Fair Employment and Housing Act*

*(Cal. Gov't Code §§12900 et seq.)*

Against Defendant Oracle

196.    Paragraph 1 and Paragraphs 3 through 146 are hereby incorporated by reference.

197.    At all relevant times, the Fair Employment and Housing Act ("FEHA", Gov't Code §§12900 et seq.) was in force and in effect and applied to Ms. Richter's employment.

198.    At all relevant times, Ms. Richter was an "employee" as defined by Government Code §12926(c).

199.    At all relevant times, Oracle was an "employer" as defined by Government Code §12926(d).

200.    Government Code §12940(h) protects an employee from retaliation if she has acted to protect rights afforded by the Fair Employment and Housing Act Government Code §§12940 et seq.).

201.    Oracle retaliated against Ms. Richter for exercising her rights under FEHA.

202.    Consequently, Oracle violated Government Code §12940(h).

203.    Ms. Richter has exhausted all necessary administrative remedies by filing a charge of retaliation with FEHA and receiving a right-to-sue letter.

THIRD CLAIM FOR RELIEF

*Retaliation in Violation of California Public Policy*

Against Defendant Oracle

204.    Paragraph 1 and Paragraphs 3 through 146 are hereby incorporated by reference.

205.     Ms. Richter engaged in protected activity when she reported, *inter alia*, (1) her concerns regarding the use of SAP's proprietary documents by Ken Heth and Patrizia Muckle, the top two officials (and former SAP employees) in Oracle's Japan and Asia Pacific (JAPAC) region, and (2) Brian Crume's concerns regarding unfair sourcing practices.

206.     In so doing, Ms. Richter tried to prevent activities prohibited by the Uniform Trade Secrets Act ("UTSA", California Civil Code §§3426 through 3426.11), the Defend Trade Secrets Act (18 U.S.C. §§1836, et seq.), and the Unfair Competition Law ("UCL", Business & Professions Code §§17200, et seq.); and tried to uphold the longstanding, fundamental public policy of promoting disclosure by Oracle and other publicly traded companies. *See* Securities Exchange Act of 1934 §13(a), *codified at* 15 U.S.C. §78m(a).

207.     Ms. Richter was subjected to adverse employment action because she had engaged in protected activity.

208.     As a proximate result of Oracle's unlawful conduct against her, as alleged in this Complaint, Ms. Richter has suffered harm, including but not limited lost earnings, emotional anguish, lost health benefits, other employment benefits, future earnings, costs of suit, and other damages according to proof.

### FOURTH CLAIM FOR RELIEF

*Intentional Infliction of Emotional Distress*

Against Defendant Oracle

209.     Paragraph 1 and Paragraphs 3 through 146 are hereby incorporated by reference.

210.     As a direct result of Oracle's and Lane's deliberate, unlawful, and outrageous act of subjecting her to a brutal, faux-Perry Mason-style interrogation, Ms. Richter has suffered severe psychological and emotional injury, mental distress and shock, humiliation, chagrin, worry, and oppression of a lasting nature.

211.     Accordingly, Oracle is liable for intentional infliction of emotional distress.

## FIFTH CLAIM FOR RELIEF

*Discrimination in Violation of Fair Employment and Housing Act*

*(Cal. Gov't Code §12900 et seq.)*

Against Defendant Oracle

212.    Paragraph 1 and Paragraphs 3 through 146 are hereby incorporated by reference.

213.    Government Code §12940(a) states that it is an unlawful employment practice for an employer to discharge or discriminate against any person in the terms, conditions, or privileges of employment because of that person's ancestry, color, national origin, race, or gender, among other things.

214.    In late 2013 or early 2014, Oracle began discriminating against Ms. Richter in the terms, conditions, or privileges of employment because her ancestry, color, national origin, race, and gender.  Ultimately, Oracle terminated her employment on Nov. 7, 2017.

215.    Ms. Richter suffered discrimination on the basis of her gender, her national origin, and her Asian American ethnicity.  Among other things, Ms. Richter was denied a promotion.  Specifically, her supervisor Randall Smith made it clear that she would not be considered for a promotion unless and until one of her colleagues (Carol Leipner Srebnick, a white female) received a promotion.

216.    In addition, Ms. Richter was penalized for (1) complying with a request from Michael Bangs, a white male Vice President who was approvingly called a "big boy" by a top Oracle HR official, and (2) *appropriately* using the word "bullshit" when referring to corporate mismanagement – an alleged offense for which other similarly situated white men or women at Oracle would not be penalized.

217.    In contrast to Ms. Richter, an Oracle senior director (Lindsay Pomeroy, a white male) was not disciplined *at all* after he unilaterally approved a $28,081,558 vendor selection without going through the required bidding process on Sept. 18, 2017, even though he had no authority to do so.[20]

---

[20]    Mr. Pomeroy had the authority to approve vendor-selection decisions without going

COMPLAINT

218.     In so doing, Oracle violated Government Code §12940(a).  As a direct and proximate result of Oracle's violation of Government Code §12940(a), Ms. Richter has suffered damages in an amount to be proven at trial.  The exact amount of Ms. Richter's damages is unknown at this time, but is within the jurisdiction of this Court.

219.     As a direct and proximate result of Oracle's violation of Government Code §12940(a), Ms. Richter has suffered severe psychological and emotional injury, mental distress and shock, humiliation, chagrin, worry, and oppression of a lasting nature.

220.     Ms. Richter has exhausted all necessary administrative remedies by filing a charge of discrimination with the FEHA and receiving a right-to-sue letter.

221.     As a further and direct proximate result of Oracle's conduct, Ms. Richter was forced to obtain legal counsel to protect her rights, and has thereby incurred attorney's fees in an amount to be proven at the time of trial.  Pursuant to Government Code §§12900 et seq. and specifically §12965(b), Ms. Richter requests the award of reasonable attorney's fees against Oracle.

222.     Oracle's conduct as described above was made with the intent to injure Ms. Richter or in conscious disregard of her rights and with the intent to vex, harass, and annoy her.  To the extent this conduct was made by Oracle's non-managing agents, Oracle ratified and adopted this conduct as its own with full knowledge of the consequences of this ratification and adoption.  Thus, Oracle's conduct pleaded in this Complaint was committed with fraud, malice, and oppression so as to justify an award of exemplary damages pursuant to Civil Code §3294.

SIXTH CLAIM FOR RELIEF

*Failure to Produce Employment Records (Cal. Labor Code §1198.5)*

Against Defendant Oracle

223.     Paragraph 1 and Paragraphs 3 through 146 are hereby incorporated by reference.

224.     Oracle failed to produce documents in a timely manner and failed to produce the

---

through Oracle's bidding process only if the total amount at issue was under $100,000.

entirety of documents due as required under Labor Code §1198.5.  Pursuant to that statute, Ms. Richter had requested, on Jan. 19, 2018, that the entirety of her personnel file be produced.  Among other things, Oracle did not produce the entirety of Ms. Richter's personnel file within the statutory period.

225.    Because Oracle violated Labor Code §1198.5, Ms. Richter is entitled to (1) recover $750, (2) injunctive relief requiring Oracle to produce the entirety of her personnel file, and (3) recover the entirety of her attorney's fees and costs.  In addition, Oracle is guilty of a criminal infraction pursuant to Labor Code §1198.5.

SEVENTH CLAIM FOR RELIEF

*Failure to Provide and Produce Wage Statements (Cal. Labor Code §226)*

Against Defendant Oracle

226.    Paragraph 1 and Paragraphs 3 through 146 are hereby incorporated by reference.

227.    Ms. Richter had requested, on Jan. 19, 2018, that the entirety of her payroll records and wage statements be produced.  However, Oracle did not produce her payroll records and wage statements in a timely manner.

228.    Because Defendant Oracle thus violated Section 226(b), Ms. Richter is entitled to (1) recover $750, (2) injunctive relief requiring Oracle to produce the entirety of her personnel file, and (3) recover the entirety of her attorney's fees and costs.  In addition, Oracle is guilty of a criminal infraction pursuant to Section 226(c).

EIGHTH CLAIM FOR RELIEF

*Violation of the Unfair Competition Law (Cal. B&P Code §§17200 et seq.)*

Against Defendant Oracle

229.    Paragraph 1 and Paragraphs 3 through 146 are hereby incorporated by reference.

230.    Oracle engaged in unfair competition defined in Business and Professions Code §17200 et seq., for their conduct is unlawful and unfair as alleged below.

231.    Oracle's business practices are unlawful.  As alleged in this Complaint, Oracle violated several California laws.  Those predicate acts constitute *per se* violations of

COMPLAINT

Business and Professions Code §17200 et seq.

232.     As alleged in this Complaint, Oracle's alleged wrongful business acts constituted, and constitute, a continuing course of conduct of *unfair* competition.

233.     The acts and practices alleged in this Complaint have caused substantial harm to California consumers.

234.     As a direct and proximate result of Oracle's actions, Oracle has prospered and benefited from Ms. Richter through those acts and omissions alleged in this Complaint.

235.     Oracle has been unjustly enriched and should be required to (a) disgorge its illicit profits and/or make restitution to Ms. Richter and other California employees who have been harmed, and/or (b) enjoined from continuing such practices pursuant to Business and Professions Code §§17203 and 17204.  Ms. Richter is therefore entitled to injunctive relief and attorney's fees as available under Business and Professions Code §17200 and related sections.

### REQUEST FOR RELIEF

Ms. Richter asks the Court to grant her the following relief:

I.     A judicial declaration that she has the contractual right to litigate, in this Court, (a) the legal issue of whether or not she can be held liable under the PIA, and (b) all of her pending legal claims in the Arbitral Proceeding; and injunctive relief to give effect to that contractual right;

II.     Contract damages according to proof;

III.     Compensatory, general, and special damages according to proof;

IV.     Consequential damages according to proof;

V.     Punitive damages in an amount to be determined;

VI.     Applicable penalties and liquidated damages according to proof;

VII.     All applicable statutory penalties pursuant to, *inter alia*, Labor Code §1198.5, according to proof;

VIII.     Any and all other applicable statutory penalties, as provided by law;

COMPLAINT

IX.     Prejudgment interest as allowed under California law, including but not limited to Civil Code §3287;

X.      Reasonable attorney's fees, expenses, and costs as allowed under Labor Code §1198.5, Labor Code §226(e) & (h), CCP §1021.5, and any other applicable provision of law, irrespective of whether it has been cited in this Complaint;

XI.     Injunctive relief, pursuant to Labor Code §1198.5, requiring Oracle to produce the entirety of her personnel file;

XII.    Injunctive relief, pursuant to Labor Code §226(h), requiring Oracle to produce the entirety of her wage statements;

XIII.   Pursuant to Business and Professions Code §§17200 through 17203, Labor Code §226(h), and Civil Code §3523, an order of disgorgement of profits and equitable relief against Oracle, its successors, agents, representatives, employees, and all persons who act in concert with Oracle in redress for all unlawful acts and conduct set forth in this Complaint; and

XIV.    All other relief that the Court deems just and equitable.


DATED:  Aug. 22, 2022

                                              BUSINESS, ENERGY, AND ELECTION LAW, PC


                                              By: /s/ Gautam Dutta
                                                  GAUTAM DUTTA, ESQ.
                                              Attorneys for Plaintiff
                                              HAONING RICHTER

- 35 -                          COMPLAINT

# EXHIBIT A

ORACLE

Proprietary Information Agreement                                                                                                Page 1 of 1

## PROPRIETARY INFORMATION AGREEMENT

*Oracle Corporation, its subsidiaries (including but not limited to Oracle America, Inc.) and its affiliates (collectively "Oracle") develop, market, license and distribute computer software products and other technology, and provide technical support, consultation, educational and other services relating to Oracle's products.  Oracle develops and uses confidential, proprietary, and trade secret information in its business.  This information may relate to technical matters, such as the development of a new product or service, or to non-technical matters, such as marketing or financial information.  As a result of your employment with an Oracle entity (your "Employer"), you may develop, receive or otherwise have access to confidential, proprietary or trade secret information which is of value to Oracle. This agreement sets forth your responsibilities and obligations concerning confidential, proprietary and trade secret information, and Developments (as defined below).*

As a condition of my employment with my Employer, and in consideration therefore, I agree to abide by the following:

1.  My employment creates a relationship of confidence and trust with respect to certain information of a confidential, proprietary or trade secret nature.  For the purposes of this agreement, all such confidential, proprietary or trade secret information will be referred to as "Proprietary Information."  Proprietary Information includes by way of illustration and without limitation:

    a)  all software and other technology developed or licensed by or for Oracle or licensed to Oracle by a third party, and any documentation relating to such software or technology; the term "software" as used in this paragraph refers to software in various stages of development or any product thereof and includes without limitation the literal elements of a program (source code, object code or otherwise), its audiovisual components (menus, screens, structure and organization), any human or machine readable form of the program, and any writing or medium in which the program or the information therein is stored, written or described, including without limitation diagrams, flow charts, designs, drawings, templates, specifications, models, data, bug reports and customer information;

    b)  Oracle's marketing and sales plans or forecasts, product development plans, acquisition plans, competitive analyses, benchmark test results, supplier and purchasing information, budgets and non-public financial information, licenses, contracts and all related documents, customer lists and information regarding other Oracle employees, their skills and compensation;

    c)  all information which Oracle has a legal obligation to treat as confidential or which Oracle treats as proprietary or designates as confidential or for internal use only, whether or not owned or developed by Oracle (for example, information Oracle receives from a third party customer, partner or potential acquisition target).

    Proprietary Information shall not include information known publicly or generally employed in the trade, nor shall it include generic knowledge that I would have learned in the course of similar employment elsewhere.  At all times, both during and after my employment with my Employer, I will hold Proprietary Information in confidence.  I will not by any means transfer, publish, disclose or report Proprietary Information directly or indirectly, except such disclosure to other Oracle employees or authorized third parties as may be necessary in the ordinary course of performing my duties for my Employer or otherwise as directed by Oracle.  I will not use Proprietary Information except in the course of performing my duties for my Employer.

2.  I hereby represent that my performance as an employee of my Employer will not breach any agreement or obligation to keep in confidence the proprietary information of a former employer or other entity or person.  I will not bring any proprietary information of a former employer or other entity or person to Oracle.  I will not use in the performance of my work for my Employer any proprietary information of a former employer or other entity or person without written authorization from my former employer, the other entity or person.

3.  I will promptly disclose to my Employer or its designee, will hold in trust for the sole right and benefit of my Employer or its designee, and hereby assign to my Employer or its designee all my right, title and interest in and to any and all ideas, discoveries, inventions or "know how," including without limitation, all processes, devices, apparatus, computer programs, programming documentation, and other works of authorship, including any modification, improvement or use thereof (collectively referred to as "Developments"), relating to any current or reasonably anticipated business of Oracle, conceived or reduced to practice by me alone or with others during the term of my employment, whether or not conceived during regular business hours.  I further acknowledge and agree that all Developments shall be the sole and exclusive property of my Employer or its designee and are

ORA_RIC00000013

considered "works made for hire" for the purposes of my Employer's rights under copyright laws.  To the extent that any Development may not be considered a "work made for hire", I hereby assign to my Employer or its designee such Developments and all rights therein, except those Developments, if any, the assignment of which is prohibited by law.  I further agree to execute any documents and to do all things necessary, without additional compensation whether during my employment or after: (a) to assign all right, title and interest in any Development to my Employer or its designee and (b) to assist my Employer or its designee in registering, prosecuting, perfecting, protecting, maintaining and enforcing any and all patent, copyright, trade secret or other right or interest in any Development for any and all countries.   This provision does not apply to Developments which qualify fully under the provisions of section 2870 of the California Labor Code, or any other statute or common law doctrine of like effect, which states:

    a)   Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

        i.   Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

        ii.   Result from any work performed by the employee for the employer.

    b)   To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

4.   If any Development assigned hereunder is based upon, or is incorporated into or is an improvement or derivative of, or cannot reasonably be made, used, reproduced and/or distributed without using or violating technology or rights owned or licensed by me and not assigned hereunder, I hereby grant my Employer or its designee a perpetual, worldwide, royalty-free, non-exclusive and sub-licensable right and license to exploit and exercise all such technology and rights in support of its exercise or exploitation of any such assigned Development(s) (including any modifications, improvements and derivatives thereof).

5.   I will not during my employment with my Employer engage in any other employment, occupation, consulting or other activity related to the business in which Oracle is now involved or becomes involved during the term of my employment.

6.   I will not, during my employment with my Employer and for a period of six months after the termination of my employment, directly or indirectly, whether through a third party or otherwise, recruit, solicit, induce, invite or otherwise encourage any Oracle employee to accept an employment or independent contractor or other business relationship with an employer or entity or person other than Oracle.

7.   I will upon termination of my employment with my Employer reaffirm my recognition of the importance of maintaining the confidentiality of Oracle's Proprietary Information and reaffirm all of the obligations set forth in this agreement.

8.   I agree that, upon termination of my employment with my Employer, I will immediately deliver to my Employer or its designee, and will not keep in my possession, recreate or deliver to anyone else, all property and materials belonging to Oracle including without limitation documents, software, discs, diskettes, tapes, records, data, notes and correspondence and copies or reproductions thereof whether or not developed by me during the course of my employment with my Employer, hardware, computers, terminals, telephones, badges, business cards, handbooks, policy manuals, software manuals and telephone directories.  Upon termination of my employment, I will immediately cease using and/or accessing any and all Oracle accounts, including but not limited to email, voicemail, and other computer and network systems or accounts.

9.   Where my conduct would constitute a misappropriation of trade secrets, unfair competition, other civil wrong, and/or if I live or work in a state or jurisdiction where such conduct can be lawfully prohibited by an employer, I agree that I will not, for a period of six months after the termination of my employment with my Employer, for my own account or for the account of any other person or entity, solicit, call on or provide services similar to those which I provided to customers or clients of Oracle during my employment, for any of Oracle's customers or clients or prospective customers or clients if I solicited, called on or performed services for that Oracle customer or client or prospective customer or client during the twelve months preceding my termination.

ORA_RIC00000014

10. I understand and acknowledge that, unless I am employed by Oracle in the state of Montana, my employment relationship with my Employer may be altered or terminated "at will" and that nothing in this agreement alters my "at will" status.

11. I understand and acknowledge that this agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of my Employer, its successors and its assigns.  My Employer may assign or transfer its rights or delegate its obligations created through this agreement at its sole discretion.

12. I agree that any legal action or proceeding involving Oracle which is in any way connected with this agreement may be instituted in federal court in San Francisco or San Jose, California or state court in San Mateo County or Santa Clara County, California.  I agree to submit to the jurisdiction of, and agree that venue is proper in, the aforesaid courts in any such legal action or proceeding.

13. If any provision of this agreement is determined to be invalid or unenforceable, the validity or enforceability of the other provisions shall not be affected.

14. I will not enter into any agreement, written or oral, that conflicts with the provisions of this agreement.  I acknowledge that this agreement survives my employment.

By pressing the 'Acknowledge and Accept' button below you are agreeing that you have read and that you understand  every provision of this Agreement and that, in consideration for your employment at Oracle, you agree to abide by its terms

You may return to the previous page without taking action by pressing the Return button below.

ORA_RIC00000015

# EXHIBIT B

| Legal Entity | Country | Vacancy Name | Hire Type | Manager Email | Applicant Name | Applicant Email | Document Name | Document | Acceptance Required? | Acknowledged Yes/No? | Acknowledged Time (Date and Time in Pacific Time Zone) | Has Doc? | Acknowledgement has to be Printed? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ORCL USA | United States | IRC2109837 | New Hire - Regular | randy.smith@oracle.com | Richter, Haoning | haoy96@gmail.com | OFFER STATUS | - | - | APL_ACCEPTED | 20-MAY-13 04:01:16.000000 PM | NA | - |
| ORCL USA | United States | IRC2109837 | New Hire - Regular | randy.smith@oracle.com | Richter, Haoning | haoy96@gmail.com | Regular Employment Agreement | View Document | Y | Y | 20-MAY-13 03:55:22.000000 PM | NA | - |
| ORCL USA | United States | IRC2109837 | New Hire - Regular | randy.smith@oracle.com | Richter, Haoning | haoy96@gmail.com | Regular Proprietary Information Agreement | View Document | Y | Y | 20-MAY-13 03:56:47.000000 PM | NA | - |
| ORCL USA | United States | IRC2109837 | New Hire - Regular | randy.smith@oracle.com | Richter, Haoning | haoy96@gmail.com | Regular Privacy Policy | View Document | N | - | - | NA | - |
| ORCL USA | United States | IRC2109837 | New Hire - Regular | randy.smith@oracle.com | Richter, Haoning | haoy96@gmail.com | Regular Offer Packet | View Document | N | - | - | NA | - |
| ORCL USA | United States | IRC2109837 | New Hire - Regular | randy.smith@oracle.com | Richter, Haoning | haoy96@gmail.com | Offer Letter | View Document | Y | Y | 20-MAY-13 03:53:37.000000 PM | NA | - |

1-5

**EXHIBIT C**

## EMPLOYMENT AGREEMENT & MUTUAL AGREEMENT TO ARBITRATE

Please read this Agreement carefully before you agree to its terms by signing it.  You may wish to consult an attorney prior to signing the Agreement.  The Agreement sets forth certain important benefits, terms and conditions related to your employment with Oracle.  It also sets forth the mutual agreement between you and Oracle to arbitrate any dispute or claim arising out of or related to your Oracle employment and to waive all rights to a trial or hearing before a court or jury, except as provided below.

#### Proprietary Information
Oracle's proprietary rights and confidential information are among the company's most important assets.  In addition to signing this Agreement as a condition of employment, you also must sign the Proprietary Information Agreement included in the New Hire Offer Packet.

#### Oracle Policies
Your adherence to the Oracle Code of Ethics and Business Conduct, set forth in a booklet that is mailed to you within two weeks of your first date of employment at Oracle, is vital to Oracle and to your success at Oracle.  When you sign this Agreement, you are agreeing to thoroughly familiarize yourself with the Oracle Code of Ethics and Business Conduct and you are agreeing to abide by it.  You also agree to take Oracle's Ethics and Business Conduct course, available on-line through Oracle's intranet.  In addition, when you sign this Agreement, you are acknowledging that you have read the letter addressing Oracle's Safety Program highlights included in the New Hire Offer Packet.  Oracle maintains an Internal Privacy Policy, which describes Oracle's privacy practices for employment-related information, including personal information that may be collected, how and where personal information is processed, to whom personal information may be provided, and how you may access and rectify personal information about you.  You agree to abide by the terms of Oracle's Internal Privacy Policy in effect during your employment; a current copy of such policy is also included in the New Hire Offer Packet.  The Oracle Code of Ethics and Business Conduct, the Oracle Employee Handbook, and Oracle's Internal Privacy Policy are all on the Oracle intranet and accessible to all employees.  You agree, after beginning employment, to access the Employee Handbook and thoroughly familiarize yourself with Oracle policies and to abide by them.  Additionally, from time to time, Oracle will communicate important information about its policies by way of electronic mail notification and/or the Oracle intranet.  By signing this agreement, you agree to thoroughly review these policy communications and to abide by them.

Oracle is a government contractor, and, as such, certain federal, state, and local laws may place prohibitions or other restrictions on the ability of former government workers, and/or relatives of current or former government workers, to be employed by or to perform certain work on behalf of Oracle.  By signing below, you are affirming that your employment with Oracle, and any work you perform while employed by Oracle, will not conflict with any such prohibitions or restrictions.

#### Employment Eligibility
In order to comply with the Immigration Reform and Control Act of 1986, the federal government requires the company to examine documents which prove your legal right to work in the United States.  Please see the Verification of Eligibility for Employment information which also is a part of the New Hire Offer Packet.

#### Benefits
Oracle offers its employees a comprehensive medical, dental, vision, life and disability insurance package through Oracleflex, a flexible benefits program.  Oracleflex may require employee contributions.  The company also offers benefits including a 401(k) Savings and Retirement Plan, an Employee Stock Purchase Plan, a Dependent Care Reimbursement Plan and an Educational Reimbursement Plan.  The details of these plans are included in the New Hire Offer Packet and/or are available on the Oracle intranet.  You understand that you must make your Oracleflex benefits elections within the limited time period set forth in the communication accompanying your personal identification number that you will receive after beginning employment.

By signing this Agreement, you authorize Oracle to deduct from your compensation any and all contributions associated with your elections under Oracleflex, the Oracle 401(k) Savings and Investment Plan, the Oracle Employee Stock Purchase Plan, or any other benefit offered by Oracle in which you participate and for which an employee contribution is required.

Your starting compensation, position and other terms and conditions related to your employment are set forth in the offer letter you received.  By signing this Agreement, you also are agreeing to the terms and conditions set forth in

the offer letter, which are incorporated herein. Oral or written representations contradicting or supplementing the terms of the offer letter are not valid.

## At-Will Employment[1]

Employment at Oracle is at-will. The company makes no express or implied commitment that your employment will have a minimum or fixed term, that Oracle may take adverse employment action only for cause or that your employment is terminable only for cause. Either you or Oracle may terminate the employment relationship at any time for any reason. Additionally, Oracle may take any other employment action at any time for any reason. No one at Oracle may make, unless specifically authorized in writing by Oracle's Board of Directors, any promise, express or implied, that employment is for any fixed term or that cause is required for the termination of or change in the employment relationship.

## Equal Employment Opportunity and Escalation Process

Oracle believes that all employees should be treated fairly and equitably in conformance with its Equal Employment Opportunity policy. We take personnel action without regard to race, color, national origin, sex, marital status, sexual orientation, gender identity, age, religion, disability, veteran status, or any other characteristic prohibited by federal, state or local law. Our commitment to this policy applies to every phase of the employment relationship, and we make every effort to comply with this policy. If, however, you feel you have not been treated fairly in some way in your Oracle employment, you agree, before taking any other action, to make a written complaint to a Director of the Human Resources Department and to allow individuals within the Department a reasonable period of time in which to investigate and informally attempt to resolve your issues.

## Mutual Agreement to Arbitrate

You and Oracle understand and agree that any existing or future dispute or claim arising out of or related to your Oracle employment, or the termination of that employment, will be resolved by final and binding arbitration and that no other forum for dispute resolution will be available to either party, except as to those claims identified below. The decision of the arbitrator shall be final and binding on both you and Oracle and it shall be enforceable by any court having proper jurisdiction.

The arbitration proceedings shall be conducted pursuant to the Federal Arbitration Act, and in accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association or the Employment Arbitration Rules and Procedures adopted by Judicial Arbitration & Mediation Services ("JAMS"). The arbitrator will have all the powers a judge would have in dealing with any question or dispute that may arise before, during and after the arbitration.

## Claims Not Covered

Claims not covered by this Arbitration Agreement are:

1. Claims under Title VII of the Civil Rights Act of 1964 or any tort related to or arising out of sexual assault or harassment, including assault and battery, intentional infliction of emotional distress, false imprisonment, or negligent hiring, supervision, or retention,
2. Claims for benefits under the workers' compensation, unemployment insurance and state disability insurance laws, and
3. Claims by you or by Oracle for temporary restraining orders or preliminary injunctions ("temporary equitable relief") in cases in which such temporary equitable relief would be otherwise authorized by law. In such cases where temporary equitable relief is sought, the trial on the merits of the action will occur in front of, and will be decided by, the arbitrator, who will have the same ability to order legal or equitable remedies as could a court of general jurisdiction.

## Costs

Oracle agrees to bear the costs of the arbitrator's fee and all other costs related to the arbitration, assuming such costs are not expenses that you would be required to bear if you were bringing the action in a court of law. You and Oracle shall each bear your own attorneys' fees incurred in connection with the arbitration, and the arbitrator will not have authority to award attorneys' fees unless a statute at issue in the dispute or other appropriate law authorizes the award of attorneys' fees to the prevailing party, in which case the arbitrator shall have the authority to make an award of attorneys' fees as permitted by the applicable statute or law.

---

[1] Note: This at-will employment provision is not applicable to employees located in the state of Montana.

**Consideration**

You understand and acknowledge that you are offered employment in consideration of your promise to arbitrate claims. In addition, the promises by Oracle and by you to resolve claims by arbitration in accordance with the provisions of this Arbitration Agreement, rather than through the courts, provide consideration for each other.

Employment Agreement & Mutual Agreement to Arbitrate                                          Page 3 of 3

**Knowing and Voluntary Agreement; Complete Agreement**

You understand and agree that you have been advised to consult with an attorney of your own choosing before signing this Employment Agreement & Mutual Agreement to Arbitrate, and you have had an opportunity to do so.

**YOU FURTHER UNDERSTAND AND AGREE THAT YOU HAVE READ THIS EMPLOYMENT AGREEMENT & MUTUAL AGREEMENT TO ARBITRATE CAREFULLY.  BY SIGNING IT, YOU ARE EXPRESSLY WAIVING ANY AND ALL RIGHTS TO A TRIAL OR HEARING BEFORE A COURT OR JURY OF ANY AND ALL DISPUTES AND CLAIMS SUBJECT TO ARBITRATION UNDER THIS ARBITRATION AGREEMENT WHICH CLAIMS YOU MAY NOW OR IN THE FUTURE HAVE.**

This Arbitration Agreement contains the complete agreement between Oracle and you regarding the subject of arbitration and alternate dispute resolution, and supersedes any and all prior written, oral, or other types of representations and agreements between Oracle and you, if any.

**Severability**

If any portion of this Employment Agreement & Mutual Agreement to Arbitrate shall, for any reason, be held invalid or unenforceable, or contrary to public policy or any law, the remainder of the Agreement shall not be affected by such invalidity or unenforceability, but shall remain in full force and effect, as if the invalid or unenforceable term or portion thereof had not existed within this Agreement.

**Modification**

This Employment Agreement & Mutual Agreement to Arbitrate may be modified only in a writing, expressly referencing this Agreement and you by full name, signed by you and Oracle's Board of Directors.

By pressing the 'Acknowledge and Accept' button below you are agreeing that you have read and that you understand  every provision of this Agreement and that, in consideration for your employment at Oracle, you agree to abide by its terms

You may return to the previous page without taking action by pressing the Return button below.